O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY R. PEEL et al., | CASE NO. 8:11-cv-0079-JST (RNBx) |
| Plaintiffs, | |
| vs. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS** |
| BROOKSAMERICA MORTGAGE CORPORATION, INC et al., | |
| Defendants. | |

1

Plaintiffs filed a class-action lawsuit in California state court alleging that Defendants engaged in fraudulent omissions, violated California's unfair competition law, and breached the contracts of class members.  Defendants removed the case to federal court; Defendants Washington Mutual Mortgage Securities Corporation and WaMu Asset Acceptance Corporation filed one Motion to Dismiss (doc. 28), and Defendant Residential Funding Company, LLC filed another Motion to Dismiss (doc. 27).  Having reviewed the papers, and taken the matter under submission, the Court GRANTS IN PART and DENIES IN PART the Defendants' Motions to Dismiss.

## I.     Background

Plaintiffs Timothy R. Peel and Cheryl G. Peel ("Peels") refinanced their existing home loan on November 21, 2006, with Defendant BrooksAmerica Mortgage Corporation ("BrooksAmerica").  (First Am. Compl. ("FAC") ¶ 3.)  The Peels entered into an Option Adjustable Rate Mortgage ("Option ARM") secured by the Peels' residence.  (*Id.*)  The same day BrooksAmerica originated the loan, it was sold to either Defendant Washington Mutual Mortgage Securities Corporation ("WMMSC") or Defendant WaMu Asset Acceptance Corporation ("WAAC") (collectively "WaMu").  (*Id.*)  Although BrooksAmerica informed the Peels that the loan was sold to one of these two Defendants, it has yet to identify the exact entity to which the loan was sold.  (*Id.*)  A copy of the Note, Truth in Lending Disclosure Statement ("TILDS"), and Prepayment Penalty Rider (collectively the "Loan Documents") is attached to the FAC as Exhibit 1.  (*Id.*)

Plaintiff Russ Bebout refinanced his existing home loan with BrooksAmerica on December 21, 2006.  (*Id.* ¶ 4.)  Bebout also entered into an Option ARM that was secured by his residence.  (*Id.*)  BrooksAmerica sold the loan to Defendant Residential Funding Company, LLC ("RFC") on January 16, 2007.  (*Id.*)  A copy of Bebout's Loan Documents is attached to the FAC as Exhibit 2.

Plaintiffs Michael Sanford and Marilyn Sanford ("Sanfords") refinanced their existing home loan with BrooksAmerica on February 13, 2007.  (*Id.* ¶ 5.)  The Sanfords

1   entered into an Option ARM secured by their residence, which was sold to RFC on the

2   same day it originated.  (*Id.*)  A copy of the Sanfords' Loan Documents is attached to the

3   FAC as Exhibit 3.  (*Id.*)

4       Plaintiff Desiree McIlrath refinanced her existing home loan with BrooksAmerica

5   on February 1, 2007.  (*Id.* ¶ 6.)  McIlrath entered into an Option ARM secured by her

6   residence, which was sold to RFC on the same day as it originated.  (*Id.*)  A copy of

7   McIlrath's Loan Documents is attached to the FAC as Exhibit 4.  (*Id.*)

8       Although not identical, Plaintiffs allege that all of the Option ARMs that are the

9   subject of the FAC have similar characteristics.  In each, there is a monthly payment

10  amount stated in the Note which is based on a low "teaser" interest rate, ranging from 1%

11  to 3%.  (*Id.* ¶ 19.)  In each, the payment schedule listed in the TILDS for the first 3-5 years

12  of the Note was based upon a fully amortizing payment at the low teaser interest rate.  (*Id.*)

13  After thirty days, however, the interest rate in fact went up to the sum of the "index" and

14  the "margin"; for each Plaintiff, this interest rate more than doubled.  (*Id.* ¶¶ 19, 20.)  The

15  fact that the payment schedule provided to Plaintiffs was based on an interest rate which

16  was inaccurate was not disclosed, and moreover, Plaintiffs' TILDSes referenced a different

17  annual percentage rate ("APR") in the upper left corner, without noting that the payment

18  schedule was based not on the disclosed APR, but on the teaser interest rate that was only

19  the actual interest rate used for the first thirty days of the Option ARM.  (*Id.* ¶ 21.)

20  Specifically, the Peels' TILDS listed an APR of 7.7232, but set forth a payment schedule

21  based on the teaser rate of 2.5%; Bebout's TILDS listed an APR of 7.8963, but set forth a

22  payment schedule based on the teaser rate of 2.5%; the Sanfords' TILDS listed an APR of

23  8.5072, but set forth a payment schedule based on the teaser rate of 2.0%; and McIlrath's

24  TILDS listed an APR of 8.6381, but set forth a payment schedule based on the teaser rate

25  of 1.5%.  (*Id.*)

26      As a result, Plaintiffs allege that, in following the payment schedule given to them

27  by BrooksAmerica, it was certain that by the second month into the subject loans,

28  Plaintiffs' payments would not cover the actual monthly payments.  (*Id.* ¶ 22.)  When this

happened, any unpaid part of the actual monthly payment due would be added to the principal balance owed by Plaintiffs; this process is known as negative amortization and results in the loss of equity from one's property. (*Id.*) Plaintiffs allege that although their loans indicate that their interest rates and payment amounts "may change," the Loan Documents were misleading, because they did not indicate that their interest rates and payment amounts were certain to change. (*Id.* ¶¶ 23-29.) In addition, although the Loan Documents indicated that negative amortization "may" occur, this statement was misleading because negative amortization was certain to occur if Plaintiffs followed the only payment schedule given to them by BrooksAmerica. (*Id.* ¶¶ 24, 26.) Plaintiffs also allege that because the Notes of the subject loans stated "I will make a payment every month. . . . until I have paid all the Principal and Interest . . ." they were misled into believing that their payments would be applied to both principal and interest, when in fact, the payments were first applied to interest. (*Id.* ¶ 30.) Plaintiffs allege that had they known of the sharply increased interest rate, the certain negative amortization on their loans, and the fact that their payments would go to pay interest first, they would not have purchased the subject loans. (*Id.* ¶¶ 28-30, 32)

Moreover, Plaintiffs allege that they were never given any option to voluntarily choose to pay some amount in addition to or different from the amount set forth in the payment schedule provided by the TILDSes and identified as their contractual payment obligation in the Loan Documents. (*Id.* ¶ 39.) Although the Loan Documents said that "[a]fter the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options," Plaintiffs argue that the referenced options were not in fact provided until after the execution of the subject loans. (*Id.*)

Plaintiffs allege that they were not informed of any of the above information about the terms of the subject loans until they were "locked" into their loans because of a prepayment penalty. (*Id.* ¶ 35.) The penalty consisted of "a prepayment charge equal to the interest . . . that would accrue during a six-month period of the amount prepaid (if the prepayment amount was greater than 20% of the original principal amount stated in the

1   Note), which was calculated at the rate of interest in effect under the terms of the Note for

2   a prepayment occurring during the first two to three years of the loan." (*Id.* ¶ 35.)

3   Plaintiffs also allege that although the subject Loan Documents failed to disclose the

4   amount by which their loan balances would increase over the first two to three years,

5   Defendants were aware of these amounts because they performed the calculations

6   internally. (*Id.* ¶ 36.)

7       Plaintiffs also allege that each of the subject loans had "payment caps," which

8   provided that, even after the monthly payment increases, the interest rate would increase

9   by no more than 7.5% per year. (*Id.* ¶ 37.) Once the principal increases to 115% of the

10  original loan, however, the 7.5% payment cap no longer applies. (*Id.*) Plaintiffs allege

11  that this is a "built-in payment shock" designed to increase the payments beyond what

12  most borrowers can afford and is thus designed to increase the risk of foreclosure. (*Id.*)

13      Plaintiffs allege that RFC and WaMu dictated and approved of the loan documents

14  and underwriting guidelines used by BrooksAmerica in the origination of the Option

15  ARMs that are the subject of the FAC ("subject loans"). (*Id.* ¶¶ 2, 43, 48.) Plaintiffs

16  allege that WaMu and RFC are assignees of the subject loans. (*Id.* ¶¶ 9, 10.) Plaintiffs

17  also allege that, pursuant to California Civil Code § 1459 and California Code of Civil

18  Procedure § 368, RFC and WaMu are the subsequent purchasers and/or assignees of the

19  subject loans. (*Id.* ¶ 16.) Thus, Plaintiffs allege that RFC and WaMu are directly liable;

20  however, Plaintiffs also argue that RFC and WaMu are liable as aiders and abettors. (*Id.* ¶

21  2.)

22      Plaintiffs allege that RFC, but not WaMu, had a client contract, under which

23  BrooksAmerica agreed to originate Option ARMs, using funds provided by RFC, and RFC

24  agree to purchase those loans. (*Id.* ¶ 49.) Plaintiffs allege that, pursuant to this contract,

25  RFC approved BrooksAmerica to originate and sell loans to RFC, provided that the loans

26  complied with RFC's Client Guide. (*Id.* ¶ 50.) Plaintiffs also allege that RFC was aware

27  of the confusing nature of the Loan Documents, because RFC's own employees could not

28  understand the Option ARMs being purchased by RFC. (*Id.* ¶ 55.) RFC offered a class for

1  its employees that explained how Option ARMs worked, so that RFC's employees could

2  properly verify the information in the Loan Documents and make certain the loan

3  standards set forth in RFC's Client Contract and Client Guide.  (*Id.* ¶ 56.)

4       Plaintiffs have filed three claims against BrooksAmerica, RFC, and WaMu: (1)

5  fraudulent omissions; (2) violations of California's unfair competition law ("UCL"), Cal.

6  Bus. & Prof. Code §§ 17200 *et seq.*; and (3) breach of contract.  Defendants RFC and

7  WaMu each filed separate a Motion to Dismiss against Plaintiffs.

8

9       **II.    Legal Standard**

10      When evaluating a Rule 12(b)(6) motion, the Court must accept as true all

11  allegations of material facts that are in the complaint and must construe all inferences in

12  the light most favorable to the non-moving party.  *Moyo v. Gomez*, 32 F.3d 1382, 1384

13  (9th Cir. 1994).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a

14  short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R.

15  Civ. P. 8(a)(2).  "Specific legal theories need not be pleaded so long as sufficient factual

16  averments show that the claimant may be entitled to some relief."  *Fontana v. Haskin*, 262

17  F.3d 871, 877 (9th Cir. 2001).  Dismissal of a complaint for failure to state a claim is not

18  proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible

19  on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial

20  plausibility when the plaintiff pleads factual content that allows the court to draw the

21  reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v.

22  Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "And, of course, a well-pleaded complaint may

23  proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and

24  that a recovery is very remote and unlikely."  *Twombly*, 550 U.S. at 556 (internal quotation

25  marks and citation omitted).

26      When the legal sufficiency of a complaint's allegations are tested by a motion under

27  Rule 12(b)(6), review is typically limited to the complaint, however, "a court may consider

28  material which is properly submitted as part of the complaint on a motion to dismiss

without converting the motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal quotation marks and citation omitted). In addition, under Rule 10(c), "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). When such a document is offered, "the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

### III.   Judicial Notice

"Generally a court may not consider material beyond the complaint in ruling on a [Rule] 12(b)(6) motion." *Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007). "A court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment," however, as long as the noticed facts are not "subject to reasonable dispute." *Lee*, 250 F.3d at 689 (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)).

Under Federal Rule of Evidence 201, a trial court must take judicial notice of facts "if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d). A fact is appropriate for judicial notice only if it is not subject to reasonable dispute in that it is (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b). Facts contained in the public record are appropriate subjects of judicial notice. *Lee*, 250 F.3d at 690; *see also Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 (9th Cir. 2006). Therefore, a court may take judicial notice of the existence of another court's opinion or of the filing of pleadings in related proceedings; the Court may not, however, accept as true the facts found or alleged in such documents. *Wyatt v. Terhune*, 315 F.3d 1108, 1114 (9th Cir. 2003) (citing *M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983)); *see also Lee*, 250 F.3d at 690.

Here, Plaintiffs have requested that the Court take judicial notice of complaints filed by the Plaintiffs in related proceedings, as well as complaints and orders from other cases. (Pls.' Request for Judicial Notice ('RJN'), Doc. 37, Exs. 1-11.)  Defendant WaMu has requested that the Court take judicial notice of an order and complaint in a related proceeding, as well as an order and complaint from another case.  (WaMu's RJN, Doc. 28-1, Exs. 3-5; WaMu's Reply RJN, Doc. 40-1, Ex. 1.)  Because all of these documents appear to be public records from either related proceedings or from other cases, and because the Court may take judicial notice of the existence of another court's opinion, for the purpose of this motion to dismiss, the Court takes judicial notice of the existence of these filings.  *See Wyatt*, 315 F.3d at 1114.

If a document forms the basis of a plaintiff's complaint, "[t]he defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."  *Ritchie*, 342 F.3d at 908.  This is permitted to prevent plaintiffs "from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based."  *Parrino v. FHP Inc.*, 146 F.3d 699, 706 (9th Cir. 1998) *superseded by statute on other grounds as recognized in Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 681 (9th Cir. 2006).

Here, Defendant WaMu has requested that the Court take judicial notice of an executed copy of the Peels' TILDS and their "Adjustable Rate Mortgage Loan Program Disclosure – Payment Option."  (WaMu's RJN, Doc. 28-1, Exs. 1-2.)  Because these documents form the basis of many of Plaintiffs' allegations, the Court takes judicial notice of these documents and assumes that they are true for purposes of the motions to dismiss. *See Ritchie*, 342 F.3d at 908.

1    **IV.    Discussion**

2         **A. Preemption**

3         RFC argues that any state law fraud claim is expressly preempted by the Truth in

4    Lending Act ("TILA"), 15 U.S.C. §§ 1610 *et seq.*[1]  (RFC Mot. at 19.)  Where a statute has

5    an express preemption clause, "the task of statutory construction must in the first instance

6    focus on the plain wording of the clause, which necessarily contains the best evidence of

7    Congress' pre-emptive intent."  *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664

8    (1993).  TILA's preemption provision states:

9              Except as provided in subsection (e) of this section, this part and

10             parts B and C of this subchapter do not annul, alter, or affect the

11             laws of any State relating to the disclosure of information in

12             connection with credit transactions, *except to the extent that those*

13             *laws are inconsistent with the provisions of this subchapter* and

14             then only to the extent of the inconsistency.  Upon its own motion

15             or upon the request of any creditor, State or other interested party

16             which is submitted in accordance with procedures prescribed in

17             regulations of the Board, the Board shall determine whether any

18             such inconsistency exists.  If the Board determines that a State-

19             required disclosure is inconsistent, creditors located in that State

20             may not make disclosures using the inconsistent term or form,

21             and shall incur no liability under the law of that State for failure

22             to use such term or form, notwithstanding that such determination

23             is subsequently amended, rescinded, or determined by judicial or

24             other authority to be invalid for any reason.

25    _____

26         [1] Specifically, RFC argues that "Plaintiffs' attempt to alter the remedial scheme of TILA," by

27    seeking to eliminate the $500,000 class action cap under TILA and impose a longer statute of
      limitations period, is preempted.  (RFC Mot. at 19.)

28

15 U.S.C. § 1610(a)(1) (emphasis added).  Under the plain language of the provision, TILA preempts all state law provisions to the extent "that the 'terms and forms' mandated by the state are 'inconsistent' with those required by TILA." *Newbeck v. Wash. Mut. Bank,* No. 09–1599, 2010 WL 291821, *3 (N.D. Cal., Jan. 19, 2010).  In addition, under Regulation Z, "[a] State law is inconsistent if it requires a creditor to make disclosures or take actions that contradict the requirements of the Federal law."  12 C.F.R. § 226.28(a)(1). "State law requirements that call for the disclosure of items of information not covered by the Federal law, or that require more detailed disclosures, do not contradict the Federal requirements."  12 C.F.R. Pt. 226, Supp. I, 28(a)(3) (Commentary on Regulation Z). "Thus, TILA preempts state law only to the extent state disclosure requirements are explicitly inconsistent with federal law."  *Jordan v. Paul Fin., LLC*, 745 F. Supp. 2d 1084, 1095 (N.D. Cal. 2010).  Thus, courts regularly find that although TILA protects creditors from inconsistent state disclosure requirements, it does not protect creditors from state statutes prohibiting unfair or deceptive practices.  *Id.* (citing cases).  Therefore, the Court concludes that Plaintiffs' claims that are based on allegations of deceptive or unfair conduct are not preempted by TILA.

## B. Claim One: Fraudulent Omissions

Under California law, the elements of a common-law claim for fraudulent omission are: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would have acted differently if she had known of the concealed or suppressed fact; and (5) the plaintiff sustained damage as a result of the concealment or suppression. *See Hahn v. Mirda,* 54 Cal. Rptr. 3d 527, 532 (Cal. Ct. App. 2007).  Allegations of fraud must be stated with particularity.  Fed. R. Civ. P. 9(b).  WaMu argues that Plaintiffs' fraud omissions claim must be dismissed because it does not satisfy the heightened pleading standards required of fraud claims under Rule 9(b) or the basic pleading standards of Rule

8(a); that Plaintiffs fail to allege that WaMu ever dealt with Plaintiffs; that Plaintiffs fail to allege reliance or causation; and that the information Plaintiffs claim was omitted was, in fact, disclosed. (WaMu Mot. at 1.) RFC makes the same arguments, and additionally argues that the fraudulent omissions claims are time-barred. (RFC Mot. at 1.)

### i. Pleading standards of a Fraud Claim

Federal Rule of Civil Procedure 9(b) requires that allegations of fraud be "state[d] with particularity." A plaintiff must include a description of the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP,* 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1048, 1066 (9th Cir. 2004)). However, in the context of a fraudulent omission claim, a plaintiff cannot plead a specific time or place of a failure to act. *Washington v. Baenziger,* 673 F. Supp. 1478, 1482 (N.D. Cal. 1987). In that instance, a plaintiff may plead fraud by alternative means. *Id.*

The purpose of Rule 9(b) is to require a plaintiff to be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz,* 476 F.3d at 764 (internal quotation marks and citation omitted). "In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme." *Id.* at 765 (internal quotation marks and citation omitted).

Both WaMu and RFC argue that the FAC fails to meet Rule 9(b)'s heightened pleading standards. However, as set forth above, the Plaintiffs have not only alleged the identities of the parties and the date on which they were misled, but they have also attached copies of the Loan Documents, which Plaintiffs allege constitute the evidence of the fraudulent omissions. The Court is persuaded that the allegations of the FAC are sufficient to meet the pleading standards under Rule 9(b). *See Ralston v. Mortg. Investors Grp.*, No. C 08-536 JF, 2010 WL 3211931, at *3 (N.D. Cal. Aug. 12, 2010).

1    Additionally, WaMu argues that the Peels fail to identify which of the WaMu

2  Defendants, WMMSC or WAAC, actually holds the loan and moreover fail to identify the

3  role of each Defendant.  The Court agrees with Plaintiffs that WaMu is in a better position

4  to know whether WMMSC or WAAC actually purchased the loan, and the fact that they

5  have chosen not to share that information does not somehow immunize both Defendants

6  from suit.  Moreover, although WaMu argues that Plaintiffs "improperly lump Defendants

7  together," the Court has reviewed the FAC and notes that although there are some general

8  common allegations made against all of the Defendants, Plaintiffs have separate

9  paragraphs making more specific allegations about the individually named Defendants and

10  the named class representatives.  (*See, e.g.*, ¶¶ 3-10, 21-23, 43-56.)

11

12               **ii.  Concealment of a Material Fact**

13    Defendants argue that the facts Plaintiffs allege were omitted were, in fact,

14  disclosed in the Loan Documents.  The Court is not persuaded by the reasoning set forth in

15  the cases cited by Defendants.  As discussed above, Plaintiffs allege that even though

16  Defendants knew that negative amortization was a certainty, Defendants suppressed that

17  fact by representing that negative amortization was only a mere possibility.  Further,

18  Plaintiffs allege that Defendants gave a payment schedule to Plaintiffs that gave them no

19  options other than making payments that were, in fact, less than the full amount due, again

20  guaranteeing the certainty of negative amortization.  These allegations are sufficient to

21  withstand a motion to dismiss.  *See Ralston*, 2010 WL 3211931, at *4.

22

23               **iii.  Duty to disclose**

24    RFC argues that they had no duty to disclose any information to Plaintiffs, because

25  the loans were made by BrooksAmerica, which is a separate and unrelated entity.[2]  RFC

26  _____

27    [2] WaMu makes a similar allegation with regard to Plaintiffs' UCL claim, but made no such
   arguments with regard to Plaintiffs' claim of fraudulent omissions except in a vague footnote
28    (footnote continued)

1   does not argue that BrooksAmerica did not have a duty to disclose material facts and the

2   Court will assume they did have such a duty for purposes of these motions.  Plaintiffs

3   argue that Defendants RFC and WaMu also had a duty to disclose because Defendants

4   were (a) aiders and abettors; (b) joint venturers; (c) subsequent purchasers; and (d) direct

5   participants.  Because the Court determines that liability against RFC and WaMu may be

6   pursued under the theory of aiders and abettors, and under the theory of joint venturers, the

7   Court does not decide at this stage whether Defendants are also liable as subsequent

8   purchasers or direct participants.

9        "California has adopted the common law rule that liability may be imposed on one

10   who aids and abets the commission of an intentional tort if the person knows the other's

11   conduct constitutes a breach of a duty and gives substantial assistance or encouragement to

12   the other to so act."  *In re First Alliance Mortg. Co.,* 471 F.3d 977, 993 (9th Cir. 2006)

13   (internal quotation marks and citation omitted).  Aiding and abetting requires "actual

14   knowledge of the primary violation."  *Neilson v. Union Bank of Cal., N.A.,* 290 F. Supp. 2d

15   1101, 1119 (C.D. Cal. 2003).  It also requires "substantial assistance" with the violation.

16   *In re First Alliance Mortg. Co.,* 471 F.3d at 993.  Here, Plaintiffs have alleged that both

17   RFC and WaMu drafted the Loan Documents which omit the material information, and

18   required BrooksAmerica to use these documents in originating loans that RFC and WaMu

19   would respectively purchase and then securitize.  Therefore, the Court concludes that, at

20   this stage, Plaintiffs have sufficiently stated a claim for aiding and abetting liability.  *See*

21   *Jordan*, 745 F. Supp. 2d at 1097; *Ralston*, 2010 WL 3211931, at *5.

22        In addition, "[a] joint venture theory requires plaintiffs to allege that two or more

23   persons who are fiduciaries that have 'a duty of disclosure and liability to account for

24   profits' acted 'to carry out a single business enterprise for profit.'"  *Jordan*, 745 F. Supp.

25   _____

26   (WaMu Mot. at 22 n.8) and in conclusory statements without citation to authority in its Reply

27   (WaMu Reply at 9). Because WaMu's arguments pursuant to the UCL claim are similar, the Court
     examines WaMu's duty to disclose at this juncture.

28

2d at 1097 (quoting *Weiner v. Fleischman*, 816 P.2d 892, 895 (Cal. 1991)).  Here, Plaintiffs alleged in the FAC that BrooksAmerica and WaMu had an agreement under which BrooksAmerica would sell Option ARMs to borrowers, and WaMu would then purchase the loans from BrooksAmerica and securitize them.  (FAC ¶ 43(d).)  Plaintiffs allege that to facilitate this process, WaMu provided a "stream of financing" to BrooksAmerica (*id.* ¶ 43(i)) and "dictated and pre-approved loan and disclosure terms and documents, including the Peels' Loan Documents."  (*Id.* ¶ 43(e).)  Indeed, WaMu "made the pre-approved loan and disclosure documents available to originators through document service companies, thereby allowing BrooksAmerica to merely insert the monthly payment amounts, interest rates and principal amounts (which were required to comply with the WaMu defendants' underwriting guidelines and rate sheets available to BrooksAmerica) into the pre-approved loan documents, print the loan documents and provide them to Class Members such as the Peels."  (*Id.* ¶ 43(f).)  Thus, the Court concludes that Plaintiffs have made sufficient allegations to pursue a theory of joint venture liability against WaMu.  *See Jordan*, 745 F. Supp. 2d at 1097.

Similarly, Plaintiffs allege that RFC and BrooksAmerica had an agreement under which RFC agreed to purchase Option ARMs originated by BrooksAmerica.  (FAC ¶ 48(b).)  Plaintiffs allege that BrooksAmerica received working capital from RFC (*id.* ¶ 48(j)) and established criteria and instructions that BrooksAmerica was to follow for loans that were to be sold to RFC.  (*Id.* ¶ 48(g).)  Thus, the Court concludes that Plaintiffs have also made sufficient allegations to pursue a theory of joint venture liability against RFC. *See Jordan*, 745 F. Supp. 2d at 1097.

### iv.  Justifiable Reliance

"To plead and prove reliance, a plaintiff must demonstrate that 'had the omitted information been disclosed, [he] would have been aware of it and behaved differently.'" *Ralston*, 2010 WL 3211931, at *5 (quoting *Mirkin v. Wasserman,* 858 P.2d 568, 574 (Cal. 1993)).  The Peels allege that, had the Loan Documents disclosed the omitted information,

14

they would not have entered into the subject loans.  (*See, e.g.*, ¶ 28.)  WaMu argues, however, that because the FAC fails to allege that the Peels "read or relied" on the Loan Documents, Plaintiff has failed to allege reliance or causation.  (WaMu Mot. 12-13.)

WaMu's reliance on *Quezada v. Loan Center of California, Inc.*, No. CIV 2:09-00177 WBS, 2009 WL 5113506 (E.D. Cal. Dec. 18, 2009) for the proposition that a plaintiff must specifically state in his complaint that he "read" the loan documents is overly formalistic and misplaced.  In *Quezada*, the court denied plaintiff's motion for class certification, because it found that the plaintiff's allegation that she did not speak English would subject her to a unique defense that she did not read and rely on the alleged fraudulent omissions when she decided to enter into the loan, which thus prevented the court from finding that typicality requirement was met.  *Id.* at *4-*5 (holding that defendants rebutted any presumption of reliance because the plaintiff did not have a good grasp of English and had the loan explained to her by a translator).  Here, Defendants have failed to point to any allegations that would rebut the presumption of reliance on the Loan Documents, other than Plaintiffs' failure to use the magic words "read and relied on." Having reviewed the FAC, the Court concludes that Plaintiffs sufficiently allege that they relied on the information in the Loan Documents.

### v.  Statute of Limitations

RFC argues that Plaintiffs' fraud claims are time-barred, stating that "[b]ecause Plaintiffs' fraudulent omissions claim is entirely based on alleged omissions about the ARM Notes terms and the disclosures at the inception of the loan, the statute began running, at the very latest, on the date that the loans closed."  (RFC Mot. at 22-23.)  RFC is correct that California Code of Civil Procedure § 338(d) sets a three-year statute of limitation to bring an action for relief on the ground of fraud or mistake.  Cal. Civ. P. Code § 338(d).  However, "[t]he cause of action in [a fraud or mistake] case is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake."  *Id.*  The provision tolling operation of the statute until discovery is an

exception, thus "the plaintiff must affirmatively excuse his failure to discover the fraud within three years after it took place, by establishing facts showing that he was not negligent in failing to make the discovery sooner and that he had no actual Or [sic] presumptive knowledge of facts sufficient to put him on inquiry."  *Sun'n Sand, Inc. v. United Cal. Bank*, 582 P.2d 920, 941 (Cal. 1978) (internal quotation marks and citations omitted).  Here, Plaintiffs' allegations that Defendants committed fraud by omitting material information from the Loan Documents for the subject loans is sufficient to invoke the tolling operation of the statute until the discovery of the fraud.  Plaintiffs' allegations suggest that the *earliest* they discovered the fraud was after the expiration of the teaser rate, which was at least 30 days after the execution of the loans.

Moreover, it is not clear to this Court whether California's doctrine of equitable tolling might be appropriate in the case at hand.  As noted by the Ninth Circuit, "California courts 'have liberally applied tolling rules or their functional equivalents to situations in which the plaintiff has satisfied the notification purpose of a limitations statute.'"  *Cervantes v. City of San Diego*, 5 F.3d 1273, 1275 (9th Cir. 1993) (quoting *Elkins v. Derby,* 525 P.2d 81, 87 (Cal. 1974)).  California has developed a three-pronged test for invocation of the doctrine: "[a] plaintiff's pursuit of a remedy in another forum equitably tolls the limitations period if the plaintiff's actions satisfy these factors: 1) timely notice to the defendants in filing the first claim; 2) lack of prejudice to the defendants in gathering evidence for the second claim; and 3) good faith and reasonable conduct in filing the second claim."  *Id.*  Of importance here is the focus on the effect of the prior claim in warning Defendants in this action of the need to prepare a defense, which requires the Court to delve into the factual similarity of the claims.  *See id.* at 1276.  "As such, 'similarity' is not easily resolved as a matter of law, without receiving evidence."  *Id.*  For all of these reasons, the Court concludes that, for purposes of RFC's Motion to Dismiss, Plaintiffs' claims are not time-barred.

### vi.  TILA Safe Harbor

RFC argues that it complied with TILA's disclosure requirements and is therefore protected against Plaintiffs' state law claims by TILA's safe harbor.  "[C]ompliance with TILA's disclosure requirements provides a safe harbor with respect to [a plaintiff's] UCL claims based only on the sufficiency of [the defendant's] disclosures."  *Hauk v. JP Morgan Chase Bank USA*, 552 F.3d 1114, 1122 (9th Cir. 2009).

As noted by the Ninth Circuit, however, "*Hauk* did not condone misleading disclosures. . . . It did not hold that a creditor was allowed to mislead consumers about information that TILA specifically requires be disclosed."  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1200 (9th Cir. 2010).  Thus the Court held that, in the context of a credit card, "an APR disclosure that is not 'clear and conspicuous' is *ipso facto* 'misleading.'"  *Id.* Here, although Plaintiffs have not made any claims under TILA, the Court concludes that, accepting all allegations in the light most favorable to the non-moving party, Plaintiffs could show violations of TILA.  Variable rate mortgages such as the subject loans must comply with the specific disclosure requirements set forth in 12 C.F.R. § 226.19(b)(2). Subsection 226.19(b)(2)(vii) states that lenders must disclose "any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment limitations, negative amortization, and interest rate carryover."  The Official Staff Commentary to this subsection explains:

> Negative amortization and interest rate carryover.  A creditor must disclose, where applicable, the possibility of negative amortization.  For example, the disclosure might state, "If any of your payments is not sufficient to cover the interest due, the difference will be added to your loan amount." . . . If a consumer is given the option to cap monthly payments that may result in negative amortization, the creditor must fully disclose the rules relating to the option, including the effects of

17

1                     exercising the option (such as negative amortization will occur

2                       and the principal loan balance will increase) . . . .

3    12 C.F.R. Pt. 226, Supp. I, at Para. 19(b)(2)(vii)(2).

4         Here, Plaintiffs have alleged that Defendants failed to disclose that if Plaintiffs

5    followed the payment schedule set forth in the TILDS, negative amortization was certain

6    to occur.  Although the Loan Documents appear to be literally accurate, they refer to

7    negative amortization as a mere possibility.  As alleged in the FAC, however, under any

8    conceivable index value, Plaintiffs' initial minimum monthly payments would not be

9    sufficient to cover interest, even at the time the disclosures were provided.  Thus, negative

10    amortization was a certainty if Plaintiffs followed the payment schedule listed in the

11    TILDS.  The Court concludes that, this is at least one example from the FAC which could

12    be shown to violate TILA's requirements of clear and conspicuous disclosures.  Therefore,

13    at this time, the Court concludes that RFC cannot take advantage of TILA's safe harbor

14    against state claims.  *See Plascencia v. Lending 1st Mortg.*, No. C 07-4485 CW, 2008 WL

15    1902698, at *5-*6 (N.D. Cal. Apr. 28, 2008).

16

17               **C.  Claim Two: Violation of UCL**

18         The UCL prohibits any "unlawful, unfair or fraudulent business act or practice."

19    Cal. Bus. & Prof. Code § 17200.  Because the statute is written in the disjunctive, it applies

20    separately to business practices that are (1) unlawful, (2) unfair, or (3) fraudulent.  *See*

21    *Cel–Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 973 P.2d 527, 540 (1999).

22    WaMu argues that Plaintiffs fail to allege a violation of California's UCL under any of the

23    three prongs.

24         First, WaMu argues that the UCL does not impose vicarious liability and that

25    Plaintiffs' factual allegations that WaMu was both a "primary participant" and that WaMu

26    "aided and abetted" BrooksAmerica's fraudulent behavior, are insufficient to show

27    participation in an "unlawful practice."  As determined by the Court above, Plaintiffs have

28

alleged that WaMu aided and abetted BrooksAmerica's fraudulent conduct; therefore, the Court rejects this argument.  *See Ralston*, 2010 WL 3211931, at *6.

Second, WaMu argues that the "fraud" prong is not met for the same reasons it argues that the fraudulent omissions claims fails, that the "unlawful" prong is not met because Plaintiffs base their "unlawful" UCL claims on their fraudulent omissions claim, and that the "unfairness" prong is not met because Plaintiffs only reiterate the standard for the claim.  (WaMu Mot. at 19-20.)   RFC similarly argues that Plaintiffs fail to make a claim under the UCL for the same reasons they fail to make a claim for fraudulent omissions.  With the exception of arguments about the "unfairness" prong, the Court examined and rejected all of these arguments in its review of Plaintiffs' fraudulent omissions claims above.

"California appellate courts disagree on how to define an 'unfair' act or practice in the context of a [§ 17200] consumer action."  *Rubio*, 613 F.3d at 1204-05.  The Court adopts the three-factor "section 5 test" from the well-reasoned opinion in *Camacho v. Automobile Club of Southern California.*, 48 Cal. Rptr. 3d 770 (2006).  Under the "section 5 test," the elements are:

(1) a substantial consumer injury;

(2) the injury outweighs any countervailing benefits to consumers or competition; and

(3) the injury could not reasonably have been avoided.

*Id.* at 777.  Here, there is no question that Plaintiffs have alleged a "substantial consumer injury."  *See Jordan*, 745 F. Supp. 2d at 1099.  In addition, although there are instances where a consumer might benefit from making a loan payment based on a low teaser rate rather than paying the full amount necessary on a variable-rate loan, here, the loan and payment schedule served to strip Plaintiffs of equity they had in their homes and push them further into debt.  *Id.*  Thus, the Court finds that the first two parts of the section 5 test are easily met at this stage of the action.

As to the third part of the section 5 test, the Court finds the analysis in *Jordan v. Paul Financial, LLC.*, a similar mortgage case, to be persuasive.  In *Jordan,* the plaintiffs brought a class-action lawsuit against both the mortgage originators and the financial institutions that allegedly funded and later purchased and securitized the subject loans.  In evaluating whether the plaintiffs alleged a UCL claim under the section 5, the court wrote:

> [Defendant] correctly points out that the loan documents specify the terms of the loan and the possibility of negative amortization. A sophisticated consumer might have been able to deduce from the loan documents that negative amortization was certain to occur because the minimum payments listed in the payment schedule were based upon a "teaser" rate rather than the APR, which was displayed in a box above the payment schedule.  Thus, a consumer could have paid an amount greater than the minimum payments required in order to prevent negative amortization. However, "the fact that Defendant may have provided a technically accurate disclosure does not excuse the potentially inadequate or misleading character of other disclosures it provided or lessen the resulting potential for confusion." *Amparan v. Plaza Home Mortg., Inc.,* 678 F. Supp. 2d 961, 973 (N.D. Cal. 2008).  Therefore, at issue is whether plaintiffs' allegations establish that they could have *reasonably avoided* the injury, not whether it was merely possible to avoid the injury.

> Plaintiffs have sufficiently alleged that they did not discover the certainty of negative amortization until they were "locked in" with a harsh prepayment penalty under the terms of the agreement.  They allege that the loan documents do not clearly specify the certainty of negative amortization.  The provision in the loan documents detailing negative amortization

states only that "[m]y monthly payment *could* be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe." Tussey Decl., ex. 18. at 92 (emphasis added). Additionally, the payment schedule does not clearly indicate it is based upon the teaser rate rather than the APR listed on the top of the page. Thus, plaintiffs have sufficiently alleged that an ordinary consumer relying on the plain language of the loan agreement might not have been able to avoid the injury of negative amortization because they did not understand it was certain to occur. This is sufficient to allege a violation of the "unfair" prong of the UCL.

745 F. Supp. 2d at 1100. Here, like the plaintiffs in *Jordan*, Plaintiffs attached to the FAC the Loan Documents that provided for certain negative amortization if Plaintiffs followed the payment schedule provided by BrooksAmerica.[3] Similarly, by the time Plaintiffs discovered the certainty of negative amortization, they were "locked in" as a result of the prepayment penalty rider. Finally, like the loans at issue in *Jordan*, the Loan Documents here indicate only that "Minimum Payment could be less or greater than the amount of the interest portion" and the payment schedules do not clearly indicate that they are based upon the teaser rate rather the APR listed on the top of the page. Therefore, for the same reasons set forth in *Jordan*, this Court concludes that Plaintiffs have sufficiently alleged that ordinary consumers relying on the plain language of the Loan Documents might not have been able to avoid the injury of negative amortization because they did not understand that it was certain to occur, and this sufficiently alleges a violation of the unfair prong of the UCL. *See id.*

---

[3] Plaintiffs' interest rates were calculated by adding a margin to the index rate. Even if the index went down to zero, the combined total of the margin and index would not be close to the teaser rate. Thus, if Plaintiffs followed the payment schedule provided to them, negative amortization was certain to occur.

1

2

3    Accordingly, the DENIES WaMu and RFC's motions with respect to Plaintiffs' UCL

4    claim.

5

6                        **D.  Claim Three: Breach of Contract**

7              In California, "[a] cause of action for breach of contract requires proof of the

8    following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for

9    nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the

10   breach." *CDF Firefighters v. Maldonado*, 70 Cal. Rptr. 3d 667, 679 (Cal. Ct. App. 2008).

11   WaMu argues that Plaintiffs cannot state a breach of contract claim against them, because

12   WaMu was not a party to the contract.  (WaMu Mot. at 22.)  Moreover, WaMu argues that

13   there was no breach, because the Peels' Note allows monthly payments to be applied to the

14   interest before principal and for an adjustable interest rate.  (*Id.* at 23-25.)  RFC also argues

15   that the remaining Plaintiffs cannot allege a breach of contract because the terms of the

16   Loan Documents are "simply not reasonably susceptible to Plaintiffs' interpretation."

17   (RFC Mot. at 25.)  Plaintiffs argue that the contracts are, at the very least, ambiguous as to

18   the application of Plaintiffs' payment to both interest and principal and the adjustable

19   interest rate.

20             "Under California law, the interpretation of a written contract is a matter of law for

21   the court even though questions of fact are involved." *Southland Corp. v. Emerald Oil*

22   *Co.*, 789 F.2d 1441, 1443 (9th Cir. 1986); *see U.S. for Use of White Masonry, Inc. v. F.D.*

23   *Rich Co.*, 434 F.2d 855, 856 (9th Cir. 1970) (citing cases) ("Whether a contract is or is not

24   ambiguous is a question of law for the court.").  "A contract is ambiguous when, on its

25   face, it is capable of two different reasonable interpretations." *United Teachers of*

26   *Oakland v. Oakland Unified Sch. Dist.*, 142 Cal. Rptr. 105, 110 (Cal. Ct. App. 1977).

27   "The fundamental goal of contractual interpretation is to give effect to the mutual intention

28   of the parties." *Bank of the W. v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992).

However, "[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."  Cal. Civ. Code § 1649.

Plaintiffs appear to argue in their Oppositions to both Motions, that because there was a minimum payment schedule and because the Loan Documents stated that the payments would go to both principal and interest, that one reasonable interpretation of the contract is that the "minimum payment" set forth in the schedule was also the amount due under the loan so that there would be no negative amortization.  Here, although the Court has held that Plaintiffs may be able to show that, considered as a whole, the disclosures of the Loan Documents provide confusing and seemingly contradictory information concerning the terms of the loan, the particular interpretation of the loan set forth by the Plaintiffs is not reasonable, nor is it supported by the plain language of the Loan Documents.  *See Plascencia v. Lending 1st Mortg.*, 583 F. Supp. 2d 1090, 1101 (N.D. Cal. 2008).  Thus, although the Court concludes that Plaintiffs may have a viable claim against Defendants for failing to disclose certain information, the Court concludes that Plaintiffs do not have a claim for breach of contract.  Therefore the Court GRANTS Defendants' Motion on this claim with prejudice.


**V.      Conclusion**

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART WaMu's and RFC's Motions to Dismiss.


DATED: June 1, 2011

                              **JOSEPHINE STATON TUCKER**
                              JOSEPHINE STATON TUCKER
                              UNITED STATES DISTRICT JUDGE